ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

FEB 20 2007

JAMES N. ~~~~~, Clerk
By: ~~~~~~ Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA,
## ATLANTA DIVISION

| | |
|---|---|
| **RUSSELL CORPORATION** | )<br>) |
| Plaintiff, | )<br>) |
| v. | ) CIVIL ACTION<br>) FILE NO.: __1:07-CV-0423__<br>) |
| **PREMIUM APPAREL S.A.** | )<br>) Trial By Struck Jury Demanded |
| and | )<br>) |
| **ANDRE M. APAID, JR.** | )<br>) |
| Defendants. | )<br>) |

-JOF

## COMPLAINT

Plaintiff Russell Corporation ("Russell"), makes and files this Complaint against Defendants Premium Apparel S.A. ("Premium Apparel") and Andre M. Apaid, Jr. ("Apaid") (collectively, "Defendants"), and shows as follows:

### NATURE OF THE ACTION

1.

Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Russell brings this action seeking a judgment declaring the rights and other legal relations of the parties, and thus settling and affording the parties relief from

uncertainty and insecurity stemming from an actual controversy concerning their rights, status and other legal relations. Specifically, Russell seeks a declaration that the existing business relationship between Russell and Defendants (the "Business Relationship") does not impose any further obligations upon Russell, and, in any event, to the extent that the Business Relationship can be construed to impose any further obligations on Russell, it is unenforceable and/or terminable at will.

## PARTIES, JURISDICTION AND VENUE

2.

Russell is a Delaware corporation authorized to transact business in Georgia, with its principal place of business located at 3330 Cumberland Boulevard, Suite 800, Atlanta, Georgia 30339, in Cobb County. Russell is engaged in the business of selling, supplying and marketing apparel, sporting goods, and equipment within the U.S. and worldwide.

3.

Upon information and belief, Premium Apparel is a foreign company, with its principal place of business located at Rue Frere Simon, Port-au-Prince, Haiti. Premium Apparel is engaged in the business of sewing and finishing clothing fabric.

4.

Upon information and belief, Apaid is a resident of the state of Florida, and maintains a residence at 7209 NW 41st Street, Miami, Florida 33166. Upon information and belief, Apaid is the sole principal of Premium Apparel.

5.

This Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1332(a) because the claims are between citizens of different states and a citizen of a foreign state, and the amount in controversy exceeds $75,000 exclusive of interests and costs.

6.

This Court has personal jurisdiction over Defendants with respect to the claims set forth in the Complaint. Pursuant to the Georgia "long arm" statute, O.C.G.A. § 9-10-91(1), Defendants are subject to personal jurisdiction in Georgia because they transact business within the State of Georgia and this lawsuit derives from that business. Specifically, Defendants have entered into a business relationship with Russell, a corporation whose principal place of business is in the State of Georgia, and the claims at issue here arise out of that business relationship. In addition, among other contacts with the State of Georgia during the course of this business relationship, Defendants have traveled to Georgia in connection with

the Business Relationship, and purposefully availed themselves of the privileges and benefits of doing business in the State of Georgia.

7.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and the defendants are subject to personal jurisdiction in this judicial district.

## FACTUAL BACKGROUND

8.

Russell incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 - 7 above.

9.

In April 2005, Russell and Premium Apparel entered into bilateral discussions designed to work out a business relationship, under which Premium Apparel would sew t-shirts for Russell in return for a fee. The principal participants in the discussions included Russell former Senior Vice President Julio Barea ("Barea") and Apaid. Russell's former Chief Executive Officer Jack Ward also was involved in some discussions, though peripherally.

10.

During the discussions, Apaid actively participated in dealings with Russell such that his actions were purposeful.

11.

In the first half of 2005, Russell and Defendants orally agreed to the Business Relationship. Under the Business Relationship, Russell would ship unfinished material from its Alabama facilities to the Premium Apparel plant in Haiti. Premium Apparel in turn would process the material into finished t-shirts, and then ship the finished t-shirts back to Russell's Alabama facilities.

12.

Premium Apparel represented that it was prepared to sew Russell's t-shirts at a minimum rate of 30,000 dozens per week, under the following pricing schedule: (a) for the first six months, Premium Apparel would sew Russell's t-shirts at a price of $2.05 per dozen t-shirts; (b) for the next six months, Premium Apparel would sew Russell's t-shirts at a price of $1.90 per dozen t-shirts; and (c) after twelve months, Premium Apparel would sew Russell's t-shirts at a price of $1.80

per dozen t-shirts. Copies of emails dated April 18, 2005 and April 25, 2005 relating to this discussion, are attached as Exhibits "A" and "B," respectively.[1]

13.

The parties never agreed to a specific duration for the Business Relationship.

14.

Premium Apparel thereafter began sewing Russell t-shirts.

15.

On several occasions, Apaid visited Atlanta to meet with Barea and other Russell employees, and during such meetings, discussions of the Business Relationship took place.

16.

However, in early 2006, the Business Relationship began to sour. Material interruptions in production at Premium Apparel frequently ensued, provoked at least in part by the tumultuous political climate in Haiti.

---

[1] For the convenience of the Court, and in certain instances to protect privileged communications, Russell has redacted all portions of an e-mail chain except for the specific e-mail communication cited in the Complaint.

17.

In fact, during most weeks in early 2006, Premium Apparel was sewing well below its minimum rate of 30,000 dozens t-shirts per week. During the first 8 weeks of 2006, Premium Apparel fell some 53,900 dozens behind schedule.

18.

During 2006, Russell began looking to other sources in more reliable locales, and with more competitive production and price schedules. Russell ultimately determined that securing services from alternate sources was preferable, including maximizing the use of its own lower cost facilities, and decided to phase out orders at Premium Apparel.

19.

On August 30, 2006, Russell's Executive Vice President, Richard D. Medlin ("Medlin"), notified Apaid of Russell's decision to stop ordering from Premium Apparel, with all orders to cease on or before December 31, 2006.

20.

Apaid objected, insisting that Russell agreed to a "long-term commitment" with respect to the Business Relationship, and urging that, if Russell ceased orders from Premium Apparel, Russell should undertake a $2,400,000.00 buy-out of Premium Apparel "to cover the residual value of [Premium Apparel's]

investment." See Sept. 5, 2006 e-mail, attached as Exhibit "C." However, in making this claim, Apaid provided no written substantiation for his assertion that the parties agreed to a "long-term commitment," or for how long this "commitment" was to last. Nor did Apaid identify any legal obligation for Russell to cover the residual value of Premium Apparel's investment.

21.

Thus, on September 6, 2006, Medlin advised Apaid by e-mail that, "[u]nless you can provide any written confirmation of a long term commitment to you, on behalf of Russell, I would ask that you begin to think about how we can help you manage the transition to phase production out." A copy of the September 6, 2006 e-mail is attached as Exhibit "D."

22.

Apaid never produced any written confirmation of a "long-term commitment," and in any event, none exists.

23.

Moreover, Apaid never asserted that Russell and Defendants agreed to any specific duration for the Business Relationship.

24.

Nonetheless, Russell, concerned about the controversy suggested by Apaid's September 5 e-mail, and sensitive to Apaid's need to manage the transition to phase out production, offered to further discuss the transition.

25.

To that end, on September 17, 2006, Medlin agreed to meet with Apaid, to address Apaid's concerns. However, Apaid adamantly refused Medlin's proposal and proclaimed that Russell agreed to a "long-term commitment" under the original pricing schedule of the Business Relationship. Medlin, therefore, reiterated that Russell would phase out orders by December 31, 2006, but offered other alternatives. A copy of the October 1, 2006 email reflecting this response is attached as Exhibit "E." Russell made a subsequent offer on December 2, 2006, but no response was received from Apaid until December 15, 2006. Copies of email correspondence dated December 2, 2006, December 13, 2006, and December 15, 2006 are attached as Exhibits "F," "G," and "H," respectively.

26.

On December 15, 2006, Apaid responded by escalating the controversy, not only rejecting the offer made by Russell, but further stating that Apaid has engaged "counsel" since "our direct discussions appear to have reached an impasse" and he

would otherwise incur "irreparable damage caused by a unilateral stop of production" (Dec. 15, 2006 e-mail, attached as Exhibit "H"). Apaid suggested a mediation process to resolve the dispute. (id.). Repeatedly Apaid characterized the state of the Business Relationship as a "dispute," in which Russell's "offers do not . . . fully account for all the damages that a unilateral decision to stop production would do to us as recognized under Haitian as well as US law" (Dec. 26, 2006 e-mail, attached as Exhibit "I"), and warning that there are "risks to both parties if we do not reach a resolution" (id.).

27.

Apaid offered to release Russell from further obligations if Russell agreed to accept a one-sided production and pricing schedule. See Dec. 26, 2006 and Nov. 20, 2006 e-mails, attached as Exhibits "I" and "J." Alternatively, Apaid proposed a non-binding mediation procedure to address what he continued to describe as a "dispute." See Dec. 15, 2006 e-mail, attached as Exhibit "H."

28.

In order to alleviate the obviously escalating tension, Russell extended the Business Relationship through January 31, 2007, and engaged Apaid in discussions to reach an agreement that would allow Russell to continue working with Apaid and Premium Apparel. (See Dec. 18, 2006 email, attached as Exhibit "K").

However, these discussions quickly stalled, with Apaid persisting that Russell agreed to a "long-term commitment" under the original pricing schedule of the Business Relationship. Apaid, now mounting a full court press, forebodingly added that if Russell ceased orders from Premium Apparel, he would "revert to other measures."

29.

Phone calls placed by Apaid to Medlin during this same period, some of which Medlin took while located in Atlanta, Georgia, were similarly laced with intimations of the consequences should Russell end production.

30.

On January 11, 2007, Medlin sent Apaid an e-mail setting forth Russell's final offer for production and pricing terms going forward, by which Russell would extend production with Premium Apparel for the remainder of 2007. See Jan. 11, 2007 e-mail, attached as Exhibit "L." Apaid rejected the offer. See Jan. 23, 2007 e-mail, attached as Exhibit "M."

31.

Understanding the real and immediate threat of being haled by Defendants into court, Medlin e-mailed Apaid on February 7, 2006, reiterating Russell's offer as set forth in Medlin's January 11, 2007 e-mail. In the February 7, 2007 e-mail,

11

Medlin gave Apaid until February 14, 2007 to either accept or decline Russell's final offer, otherwise Russell would cease all product shipments to Premium Apparel without further notice. A copy of the February 7, 2007 e-mail is attached as Exhibit "N."

32.

After notifying Medlin that he was in "consultation" regarding the matter (Feb. 8, 2007 e-mail, attached as Exhibit "O"), Apaid rejected Russell's offer, and proposed an untenable counter-offer. See Feb. 13 email attached as Exhibit "P." On February 19, 2007, Russell rejected Apaid's counter-offer.

33.

Russell, having adhered to all of its obligations under the Business Relationship and having attempted to propose a solution that would allow the parties to continue working together, is now left in the position of either continuing to place orders with Premium Apparel pursuant to alleged obligations it does not believe it owes, or stopping the orders.

34.

Should it elect to stop orders, however, Russell is faced with risk stemming from the unsettled and disputed obligations between the parties. Defendants have repeatedly, albeit without any valid basis, threatened litigation if Russell stopped

placing orders with Premium Apparel, on the ground that Russell agreed to a "long-term commitment" and thus may not terminate the Business Relationship. While Apaid's claim is unsubstantiated and wholly unjustified, Russell is faced with the specter of baseless claims and litigation that has been repeatedly threatened. Absent resolution of this controversy, Russell is faced with uncertain rights and legal relations.

35.

Consequently, this case presents an actual controversy, in which Russell and Defendants are asserting adverse claims, upon a state of facts wherein a legal judgment is sought by Russell to provide it relief from uncertainty and insecurity with respect to its rights, status, and legal relations.

36.

The ends of justice require that a declaration of the parties' rights should be made.

## COUNT ONE
## DECLARATORY JUDGMENT

37.

Russell incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 - 36 above.

38.

As shown above, there is an actual and justiciable controversy between Russell and Defendants growing out of the above-stated facts and the above-referenced Business Relationship.

39.

Russell seeks a declaratory judgment from the Court that Russell owes no further obligations to Defendants.

## COUNT TWO
## DECLARATORY JUDGMENT

40.

Russell incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 - 39 above.

41.

As shown above, there is an actual and justiciable controversy between Russell and Defendants.

42.

In the alternative to the relief sought in Count 1, Russell seeks a declaratory judgment from the Court that, because the Business Relationship lacks a specific duration, the Business Relationship is unenforceable and/or terminable at will.

**WHEREFORE**, Russell respectfully requests the following relief from this Court:

(1) A trial by struck jury on all issues so triable;

(2) a declaratory judgment against Defendants declaring that Russell owes no further obligations to Defendants;

(3) alternatively, a declaratory judgment against Defendants declaring that the Business Relationship is unenforceable and/or terminable at will;

(4) an award of all attorney's fees, costs, and expenses incurred in this matter; and

(5) such other and further relief as the Court deems appropriate.

**Jury Demand: Plaintiff requests trial by a struck jury.**

Respectfully submitted, this 20th day of February 2007.

*Robert C. Khayat*
L. Joseph Loveland
Georgia Bar No. 459350
Robert C. Khayat, Jr.
Georgia Bar No. 416981
KING & SPALDING LLP
1180 Peachtree Street
Atlanta, Georgia 30309
(404) 572-4600
(404) 572-5134 (facsimile)

ATTORNEYS FOR PLAINTIFF
RUSSELL CORPORATION